## In re Green

*C. Brewster Rhoads*, for Committee of Censors.

*L. Arthur Greenstein*, for respondent.

PER CURIAM, April 15, 1935.—On February 4, 1935, a rule was entered by the court upon the above-named respondent, Charles J. Green, to show cause why he should not be disciplined for professional misconduct, as set forth in a summary of testimony and report taken before a special committee of the bar association. It was averred in the order entering the rule that the respondent had been guilty of unprofessional conduct, in that he had entered into agreements or understandings with persons known to be members of criminal organizations engaged in conducting extensive unlawful gambling operations, to represent professionally and to defend them and their subordinate agents and operatives, should they or any of them be at any time thereafter arrested and charged with violations of the laws of the Commonwealth against gambling or crimes related thereto; and that the respondent did, in pursuance of said agreements or understandings, made in advance of arrests, and in contemplation of the future commission of criminal offenses,

in promoting the operation and unlawful purposes of said criminal organizations, thereafter himself or by and through his professional associates, acting with or for him, represent many such agents and operatives when brought to hearing and trial in the courts of justice; and did directly or indirectly receive pay for his said professional services from the principal members of the said criminal organizations, and not directly from the defendants.

The respondent on February 11, 1935, filed an answer to the said rule, denying specifically and categorically all the averments in the rule entered upon him. The cause came on for hearing before the court sitting en banc, composed of five President Judges of the Courts of Common Pleas of Philadelphia County. The respondent had previously testified before the special committee of the bar association, and it appeared from the testimony so taken before the bar association and before the court that the respondent was a partner of Arthur S. Werblun from October 1928 to December 1934, covering the period that Werblun represented one Mickey Duffy and other well-known criminals, principally engaged in what is known as the "numbers game"; and, bearing on his knowledge of the arrangement between Werblun and Duffy, whereby Werblun was paid a fixed salary, respondent testified:

"Q. What do you know about the Duffy arrangement that Mr. Werblun has told about? A. Mr. Werblun told me that Mr. Duffy and he had an arrangement whereby certain work would be referred to him from time to time; that apparently it was inconvenient, for a reason I do not know, to pay for the case as it arose. He (Werblun) would keep a list of cases that he handled on his desk, little memorandums, as he handled the case, charge up a certain amount for it, and now and so often send over that list, I presume, from what he tells me, to Duffy, who would strike a balance with him. In the meantime, Duffy, in order to keep him going, would send in occasionally a hundred dollars, maybe two hundred dollars, and it would all be marked off on the list that Mr. Werblun kept in such cases that he had already charged up, bring the money over to me, tell me what the cases were, how much for the case, and I would so enter it in the book and deposit the money. It was always in cash. . . . Q. You have represented cases in which the defendants were charged with lottery or number writing? A. I have represented certain cases charged with lottery; yes. They were firm cases. Mr. Werblun would have them, as it were, he could not handle them because he was busy in some other court or maybe otherwise occupied, and he would ask me to take care of them, which I did. Q. You divided up the work? A. Divided up the work. Q. As each day came along, for your mutual convenience? A. That is right. If your question is meant as to personal cases that were referred in to me, then— Q. I did not mean that. You personally had no number cases? A. No. Q. Of your own? A. No—maybe possibly one or two. I cannot recall."

The respondent further testified that he opened a new book of accounts after pages covering the period from April 1929 until the end of that year had been torn from the book by Werblun. The new book opened by the respondent covered the years 1930, 1931, and part of 1932 up to May, the entries showing income and allocation to different cases.

"Q. That book would have covered the period of time in which Mr. Werblun has related that Duffy paid money to the firm? A. That is right. Q. Do you know where that book is? A. I do not know. I was under the full belief, as I told the committee, that the committee had that book all the time. I certainly thought they had all our books."

The respondent further testified that he accidentally tore out page 202 of

the old book, so that there was no book which indicated the receipts for May 1932.

The respondent admitted that he knew Mickey Duffy was paying lump sums or salary to Werblun and that he was receiving, as a member of the firm, a share from Duffy's payments. He affirmed his testimony before the committee, which was that he, as a member of the firm, represented Agnes Stein, a notorious number backer; that as the bookkeeper for the firm he made several entries of fees received from one Stein.

Referring again to the respondent's knowledge of the fee paid by Duffy, the respondent testified:

"Q. But Duffy was paying it (the fee), was he not? A. So I understand. Q. It is not a question of understanding; do you know it or not? A. Yes. Q. Then you do know that Duffy was paying these various lump sums; is that correct? A. That is correct, yes. Q. You knew that? A. Yes. Q. And you participated in it to the extent of your partnership share in what he paid? A. Yes. Q. And it is correct, as your partner has testified, that Duffy would pay lump sums of $100? A. That is right. Q. One hundred dollars a week, and sometimes would pay one hundred dollars where no services had been performed during that week; is that correct? A. I am not aware that he paid any money when no services were performed. Any money that came in to me was definitely allocated as to what it was for, what cases were handled, and it would so appear. Q. So, if you would allocate it to the name of the Duffy defendant, if the amount allocated to him exceeded the $100, you would go back to Duffy for the excess amount of money due? A. That is right. Q. In other words, it was merely a payment on account? A. That is right. Q. The purpose of allocating the portion of $100 paid by Duffy each week, of allocating that to this or that henchman of Duffy's, was that if your services to his subordinates exceeded the $100 you would go back to Duffy for whatever else over and above the $100 was necessary to be paid, to compensate you for the services you rendered his subordinates? A. That's right. Q. How did he pay, by cash or by check? A. I believe he paid in cash. Q. Did Werblun turn it over to you? A. Yes. Q. And told you that it came from Duffy? A. Yes. . . . Q. But when he handed it to you he said this is Duffy's money and it is to be allocated to such and such a case? A. Yes. Q. That is to say, in the accounting with Duffy you would make up a statement of cases? A. I would not make up any statement. Q. No, but a statement would be made up that Duffy would be charged and he would be given credit for his $100 a week? A. No; I never charged or credited Duffy at all. Q. Not you, but a statement would be made up and Duffy would be given credit for the $100 a week and then he would be asked to pay whatever else was due? A. I suppose that is right. Q. That is what you meant by your testimony previously? A. Yes. Q. And the certain sums you referred to there was the $100 a week? A. That is right."

It further appears from the testimony that a number of men engaged in the lottery or "numbers game" as writers and pick-up men were arrested, bail furnished without defendant's request, by someone unknown to the defendant, notice of trial was left with the defendant by an unknown person; defendants would then go to the office of Werblun & Green and later to court, or directly to court, where they were represented by either Werblun or the respondent, Green. Defendants were not asked to pay a fee and no fee was paid by the defendants. In the case of Clarence Palmer, the backer informed the defendant that he would take care of everything. This case is typical of other cases represented by the firm of Werblun & Green.

It is not necessary to further review in detail the testimony taken before the

committee and the court. It is only fair to the respondent to state, however, that it does not appear that his contact with the numbers backers and their subordinates, or Mickey Duffy, was as intimate as that of Werblun, nor that the respondent obtained business from bankers or backers in the lottery business. But the conclusion is unavoidable that the respondent, Green, knew of these contacts, he was fully aware of the arrangement for the payment of a salary or lump sum by Mickey Duffy, and admitted that he received his share of this and other fees paid the firm by well known violators of the law. It is unbelievable that the respondent, being admittedly a partner of Arthur S. Werblun, keeping the books, and making the allocations he referred to, knew nothing of the source of the firm's income, notwithstanding he admits that he knew of this arrangement or contract between Werblun, representing the firm, and Mickey Duffy. It is obvious that he was aware of the activities of his partner, Arthur S. Werblun, in representing for backers the subagents in the numbers game, the respondent sharing in the fees. He is equally culpable. We are of opinion respondent was guilty of professional misconduct, that he has violated the canons of professional ethics adopted as the rules of conduct for members of the bar, and it is the order of the court that the respondent be disbarred.

### Decree

And now, April 15, 1935, upon consideration of the rule entered by the court, and after hearing thereon, it is ordered that the rule be made absolute, and that the said respondent, Charles J. Green, be and is hereby disbarred from practicing at the bar of the Courts of Common Pleas, Orphans' Court and the Municipal Court of the County of Philadelphia, and that his name be stricken from the roll of attorneys.

Notice of this order to be given by the prothonotary of the court of common pleas to the Supreme and Superior Courts of Pennsylvania, the several Courts of Common Pleas, the Orphans' Court and the Municipal Court of the City and County of Philadelphia.